ELECTROLUX CORPORATION *v.* CORNELIUS J. DANAHER, ADMINISTRATOR.

MALTBIE, C. J., AVERY, BROWN, JENNINGS and ELLS, Js.

Argued October 7—decided December 5, 1941.

*Harry Silverstone,* assistant attorney general, with whom, on the brief, was *Francis A. Pallotti,* attorney general, for the appellant (defendant).

*Edward J. McCarthy,* with whom, on the brief, was *Martin F. McKeon,* for the appellee (plaintiff).

JENNINGS, J. This case is concerned with the status of the sales representatives of the plaintiff under General Statutes, Cum. Sup. 1939, § 1334e (a) (1) of the Unemployment Compensation Act. The pertinent portion of this section reads as follows: " 'Employment,' . . . shall mean any service . . . performed under any express or implied contract of hire creating the relationship of master and servant." Since the sales representatives were employed under a written contract, we look first to see whether it created the relationship of master and servant. The administrator found that it did, determined that contributions were due from the plaintiff based on the commissions paid to these sales representatives and notified the plaintiff of his decision. On appeal to the Superior Court, judgment was for the plaintiff and the defendant appealed to this court.

The finding may be summarized as follows: The plaintiff is engaged in the manufacture, sale and service of the Electrolux vacuum cleaner, including parts, accessories and supplies. A vice president in charge of sales directs a nationwide sales organization. The country is divided into twenty-seven districts, each district being in charge of a district manager. The

districts are divided into branches in charge of branch managers and each branch has one or more sub-branches called depots in charge of a depot manager. Substantially all of Connecticut constitutes one district in charge of a division manager who is also branch manager of the Hartford office. Other branches are located in New Haven and Bridgeport. All expenses of the branch offices are paid by the plaintiff except the expense of contests run by the branch managers. It is admitted that the salaries and commissions of the office personnel, including division, branch and depot managers, are subject to contribution.

The actual sales of the plaintiff's products in Connecticut are made by approximately one hundred and twenty-five sales representatives. The services of these men are obtained, for the most part, by inserting advertisements in the local newspapers, usually supplied and paid for by the plaintiff, although some men apply of their own accord. The applicant is interviewed by an office man, the work is explained, he may, if he desires, observe selling in the field and a printed contract form is submitted to him. He reads it and, if he desires to go into the business of selling the cleaners, he and the branch manager sign it.

The contract covers the respective rights and duties of the parties in great detail and covers seven pages of the printed record. It provides in substance that the sole function of the sales representatives is to obtain orders, under a nonexclusive franchise, for cleaners on the standard form of order blank at the prices and terms therein stated, which they agree not to vary, and their service is completed when an order is obtained and the money and trade-in machine, if any, is turned over to the branch manager. They also agree not to sell or otherwise deal in other cleaners, new or used. The collection of accounts, the service

and repair of cleaners and the making of adjustments with customers are all handled by the branch office.

The sole compensation of the sales representative is a commission, fixed in the contract, on sales made. He pays all his own expenses. Each week the plaintiff delivers to him a settlement record, stating all debits and credits in detail, and pays any amount shown to be due. Provision is made for the adjustment of commissions due to uncollectible accounts and the like and commissions on payments made more than thirty days after the last sale of a cleaner under the contract are forfeit. Parts and supplies taken by the sales representative for his own use or resale are sold directly to him by the plaintiff. Each sales representative must establish credit with the plaintiff in the amount of not less than $100 by deposit of cash or otherwise. If cash is deposited, 6 per cent interest is paid by the plaintiff. A bond to the satisfaction of the plaintiff must also be furnished. The representative must protect and indemnify the plaintiff against any claims in contract or tort by reason of the conduct of his business.

Paragraph 9 of the contract reads as follows: "It is contemplated that Electrolux may from time to time submit to the Representative suggestions as to methods of handling and selling Electrolux products with a view to promoting for their mutual benefit the sale through the Representative of such products, but the Representative reserves the right to accept or reject such suggestions, with the exception of the terms, conditions and limitations contained in this Agreement, and to conduct his business and devote such time thereto as he deems advisable and conducive to the best results."

The contract provides for its termination by either party on thirty days' notice and by Electrolux without

notice if the representative enters into a similar agreement with any other branch office or violates any one of three paragraphs relating to the terms of sale, misrepresentation of the plaintiff's products, failure to deposit promptly money or trade-in cleaners received, and sale of other cleaners. It also specifies that it contains the entire agreement between the parties.

No variation in practice from the terms of the contract is found. Representatives in each branch are assigned to groups under a group leader or team captain whose advice is available to him on request. "Pep" meetings are held each morning at the branch offices and depots at which successful methods are recounted. These meetings are sometimes attended by the branch managers. "Clinic" meetings are also held Friday evenings where successful methods are demonstrated. Attendance at these meetings is optional. Occasionally advisory suggestions are also made through literature furnished. Contests are conducted both by the home office and by the branch managers. No book of rules and regulations concerning the sale of cleaners, no office space, clerical assistance, transportation, business cards, list of customers or telephone is furnished to the sales representatives by the plaintiff.

When the representative is ready to start out, a complete cleaner is delivered to him against a consignment receipt. When the cleaner is returned or sold, the receipt is given back to him. Unsold cleaners are to be returned at the end of two weeks and exchanged for a new cleaner. In practice, the machines are usually sold by demonstration in homes or offices but the representative is at liberty to use any method he chooses and to spend as much or as little time as he wishes. No reports are required and he may sell anywhere he pleases, although, if the sale is outside the territory of the branch office, his commission on sales

on credit is slightly reduced. Some representatives devote all of their time to the work while others are employed in factories and sell during their spare time and on week ends.

The plaintiff is the successor in selling the cleaners of Electrolux, Inc., which had been a subsidiary company. The latter used, in general, the same personnel and selling methods but both the contract and practice thereunder differed from those used by the plaintiff. A sales representative uses any means or method he wishes, subject only to the certain definite requirements in the contract previously referred to; he determines for himself how much time he will devote to the business; he is not required to obtain any definite volume of business, to follow any prescribed route or keep to any definite territory; he is not subject to any rules or regulations concerning the method of selling the cleaners; if he uses an automobile it is his own and operated at his expense; nor is he required to report the visits he has made or how he has spent his time.

The trial court concluded that the plaintiff did not have the right of general control over the sales representatives by virtue of its contract, that it did not in fact exercise general control, that the relationship of master and servant under the statute was not created and that the contrary holding by the administrator was unreasonable, arbitrary and illegal.

Numerous assignments of error were addressed to the finding. No change material to this appeal can be made. One rather novel method of assignment was used. The defendant claims the trial court erred in refusing to find facts set forth in the draft finding "which were facts which upon the record could reasonably have been found by the Administrator as facts." As pointed out in *Beaverdale Memorial Park,*

*Inc.* v. *Danaher*, 127 Conn. 175, 183, 15 Atl. (2d) 17, where, as here, the determination of the administrator is made ex parte and without notice, the aggrieved party is entitled to a full hearing in the Superior Court. A conclusion by that court upon the facts found by it that the assessment was improper necessitates the further conclusion that the administrator acted illegally. There is no place in such a proceeding for the type of assignment of error referred to. In so far as the assignments attack conclusions, they raise the fundamental issue on this appeal: do the subordinate facts support the conclusion?

In spite of the industry of counsel, little assistance has been gained from the examination of numerous decisions of other states. To quote one, nevertheless, "the ultimate test depends upon divers considerations of varying importance, all of which must be considered, and no one of which is determinative; and it is extremely difficult, if not impossible, to make a statement of definite facts by which the status of a given person can unfailingly be determined." *Kelley's Dependents* v. *Hoosac Lumber Co.*, 95 Vt. 50, 52, 113 Atl. 818; *Northwestern Mutual Life Ins. Co.* v. *Tone*, 125 Conn. 183, 190, 4 Atl. (2d) 640. This principle, as will be seen, makes the application of even Connecticut precedents difficult.

Whether an individual is a servant or occupies some other relationship, such as that of independent contractor, is ordinarily a question of fact. *Manning* v. *Woodland Tobacco Co.*, 113 Conn. 282, 287, 155 Atl. 61; *Tierney* v. *Correia*, 120 Conn. 140, 146, 180 Atl. 282; *Francis* v. *Franklin Cafeteria, Inc.*, 123 Conn. 320, 326, 195 Atl. 198. This court has recently considered whether the trial court could reasonably reach its conclusion on this question under the facts found and the statute here involved in four cases, the

*Beaverdale* and *Northwestern Mutual* cases just cited, *Jack and Jill, Inc.* v. *Tone,* 126 Conn. 114, 9 Atl. (2d) 497, and *Robert C. Buell & Co.* v. *Danaher,* 127 Conn. 606, 18 Atl. (2d) 697. The principles to be applied and the factors to be considered are fully discussed in those cases but the ultimate query in each is, as applied to this case, did the plaintiff have the right of general control over the means and methods of work of the sales representatives? *Northwestern* case, p. 191; *Jack and Jill,* p. 119; *Beaverdale,* p. 179; *Buell,* p. 611.

The gist of the finding in this case is that the plaintiff placed a vacuum cleaner in the hands of each of one hundred and twenty-five sales representatives and turned them loose. They could go where they would, spend as much or as little time as they chose and use any methods which they thought would be effective. They were bound by no suggestions or directions of the plaintiff beyond the terms of the contract. These constituted no more than the partial and limited control referred to in *Norwalk Gaslight Co.* v. *Borough of Norwalk,* 63 Conn. 495, 524, 28 Atl. 32.

The defendant claims that the transfer from Electrolux, Inc., to the plaintiff under the circumstances disclosed by the finding indicated that no real change in the relationship occurred. The trial court overruled this claim and was within its rights in so doing. The fact that under a former arrangement an agent had been an ordinary retail merchant does not prevent the parties from changing the relationship which will be upheld in the absence of fraud. *U. S.* v. *General Electric Co.,* 272 U. S. 476, 484, 47 Sup. Ct. 192. No fraud is alleged. All of the other claims in his brief—that the sales representatives were not engaged in an independent calling, control over the subject of sale, its terms and proceeds, and the right of discharge—

are disposed of by the reasoning of the four Connecticut cases referred to.

In the *Northwestern* case, a reservation, the Superior Court was advised that life insurance soliciting agents, operating under a general agent, did not come within the law. That case, at page 193 et seq., also distinguished the principal earlier Connecticut cases relied on by the defendant here. The *Beaverdale* case placed a sales manager of the sale of cemetery lots and the men working under him in the same category, holding that the trial court could not reasonably conclude that they came within the act. In the *Jack and Jill* case, the young men selling ice cream, bought by them from the company, used company trucks, bearing the company name, were confined to established routes, wore a distinctive unform furnished and laundered by the company and were required to work until 11 p.m. and to inform the manager where they could be found at half-hourly intervals. They were inspected while working by company officials and were occasionally discharged for failure to conform to the directions given. No error was found in the conclusion of the trial court that the drivers were within the act. In the *Buell* case, the men involved were stock salesmen under oral contracts, terminable at will. Their commissions were held to be subject to contribution under the act. The company furnished them desks in its office with telephone and ticker service, statistical information, consultation rooms and business cards. A large portion of the business was done by telephone. Great care was used in the selection of customers and the partnership reserved the right to terminate business relations with any customer considered unsatisfactory. The holding on appeal was that "We cannot hold that the trial court could not reasonably reach the conclusion it did."

The determination of the status of individuals similarly situated is often difficult. *Buell* case, p. 610. Applying the principles of the cases just discussed to the facts of this case, we cannot say that the trial court erred as a matter of law in reaching its conclusion. Nor do we find anything in the facts of the *Jack and Jill* and *Buell* cases which put them in the position of controlling the decision in this case.

There is no error.

In this opinion the other judges concurred.