FULLER BRUSH CO. v.
UNEMPLOYMENT COMPENSATION COMMISSIONER

SUPERIOR COURT          HARTFORD COUNTY          FILE No. 66666

Memorandum filed July 22, 1946.

*Hewes, Prettyman, Awalt & Smiddy,* of Hartford and New London , and *Harold E. Mitchell,* of Hartford, for the Plaintiff.

*Francis A. Pallotti,* Attorney General, *Harry Silverstone,* Assistant Attorney General, for the Defendant.

CORNELL, J.  Plaintiff (the appellant) is and for many years has been, engaged in the manufacture of a wide variety of brushes, dust mops, brooms and other articles.  It has a large factory at Hartford in this state, where such merchandise is produced.  At one period in its histoy it marketed its products through stores owned and operated by it.  Since abandoning this policy many years ago, it has sold its industrial merchan-dise directly to manufacturing and other like establishments through its own salesmen.  By far the greater part of its output consists of brushes for household and personal use.  These, for a long period, it has caused to be sold direct to the consumer — that is, in homes throughout the country through the medium of individuals whom it designates as "dealers" who call on housewives, principally, and solicit orders from them.  The dealers who average about 6000 in number are an im-portant part of a selling organization administered by plaintiff.  At its head is plaintiff's second vice-president and general manager who is responsible to plaintiff's president, Mr. A. C. Fuller, under whose genius the business has developed.  Herein he is referred to as the "Sales Manager."  Under such sales plan, the entire area of the United States is divided into nine divisions, each of which is in charge of a division manager answerable directly to the sales manager.  The divisions are subdivided into branches over each of which is a branch man-ager working under the supervision of the district manager.  The territory covered by each branch is partitioned into sec-tions, each of which is captained by a field manager who is also referred to as a unit manager.  The branches are, in turn, separated into "blocks" which are territorial areas estimated to contain not more than two thousand families or about nine thousand persons.  These blocks are allocated to dealers who contact the persons living in the homes located therein for the purpose of acquainting them with the merchandise and solicit-ing purchases of as many of such items as possible.  The sole

purpose of this integrated organization is the marketing of the household and personal goods made in plaintiff's Hartford factory and, incidentally, the creation of a greater demand for plaintiff's products.

All of the managers from field to division are plaintiff's employees. However, field managers are permitted to have a dealer's block allocated to them and when engaged in selling therein occupy the same status as other dealers. To insure the maximum efficiency of the sales organization, sales quotas are issued to each of the division managers by the sales manager; by each of the division managers to their branch managers and by each of the branch managers to their field managers. While there is no inflexible rule that these be attained or maintained, as the case may be, in every instance, it is, nevertheless, evident that the object of fixing them is to induce constant effort toward such ends. Primarily, the achievement of results satisfactory to plaintiff, depends upon a sufficient number of dealers to cover the blocks. For this reason there is a practically continuous effort on the part of field and branch managers to induce persons considered desirable to become dealers. Coupled with this, is the objective of obtaining a good, and if possible, increasing sales volume from the blocks to which dealers are allotted. This is contributed to by resort to various dedices (such as prize and other contests) meetings of dealers with branch and field managers and the use of inspirational and exhortative literature and communications.

Prior to 1936, persons to whom a block was allocated and who therein solicited purchases of plaintiff's merchandise were termed "representatives." When such an individual entered upon his activities, he executed a printed "Memorandum of Agreement" prepared by the plaintiff in which as well as in some other respects he agreed: (1) to sell Fuller brushes under the provisions of such agreement "and the 10 Standard Sales Policies"; (2) to make a specified minimum number of demonstrations each week "to assure me of a proper volume of sales and income and to assure you that customers will be called on at regular intervals" and "to give a Fuller Handy Brush or its alternative at every demonstration"; (3) to deliver orders taken, collect retail prices and make immediate remittance to your distributing station of the wholesale price on all goods ordered, except net items which I will pay in full; (4) to confine his sales to the territory allotted to him and to "work

my territory in a thorough and systematic manner"; (5) to present customers with premium merchandise, "in accordance with your premium plan and to pay you for such merchandise at your wholesale prices"; (6) to "pay cash with order or file an acceptable letter of credit for $200.00 or make cash deposit of $200.00 by certified check or draft or file your surety bond"; (7) that goods are to be shipped to him on a strictly "one-order" basis — that is, that any one order shipped him must be paid in full before a second order would be shipped and if any order shipped, together with the balance due exceed $200, the excess shall be shipped charges collect; (8) that orders will be sent to plaintiff's distributing station promptly, plaintiff to prepay transportation charges on all orders of a retail value of $50 or more; acknowledges receipt of a complete demonstration outfit which is to remain the plaintiff's property which he agrees to return upon the termination of the agree-ment to plaintiff's distributing station and to pay plaintiff for any articles missing or not in salable condition at the existing wholesale price; acknowledges receipt of two hundred sample gift items for which he agrees to remit in two payments of $2 each when paying for his third and fourth orders for merchan-dise; that his compensation shall consist of a "base commission of 35% plus a 5% profit sharing commission or a total of 40% of the "entire retail price" until he has completed one full term of work according to plaintiff's special calendar; that plaintiff shall have the right to change prices and " 'commission rates' "; and that, any violation of the provisions mentioned or lack of sufficient ability for the work undertaken, may be considered sufficient cause for plaintiff's terminating the agree-ment. When, about 1936, the use of the agreement summarized was discontinued, another was immediately adopted under which the relation subsisting between plaintiff and its dealers was regulated. This was in effect at the time the asessments hereinafter referred to were made, and still is. In substance, it merely provides that the plaintiff grants to the dealer "the right to purchase" at one of its distributing stations selected by plaintiff, "at current wholesale prices" its household line of merchandise and to resell the same in territory mutually agreed upon; the credit terms upon which the dealer may purchase such wares are substantially those contained in the earlier form of agreement inclusive of the proviso that no order for goods will be shipped until payment has been made for the merchandise contained in the order next preceding with the

added requirement that in any event payment shall be made within thirty days. It is stipulated that either party may terminate the agreement at any time by written notice mailed to the other, without liability for any claim because of such termination; that upon the termination of the agreement, the dealer undertakes to pay any balance owing to plaintiff. As respects any goods purchased from plaintiff which the dealer may have on hand at the time the agreement is terminated, it is provided, that the dealer may return the same but plaintiff's obligation to accept them is conditioned upon their being in as good condition as when shipped by it, in which event if plaintiff repurchases such merchandise it will pay to or credit the dealer's account for the value of same computed at the wholesale prices at which the dealer purchased them. There are also provisions to the effect that the dealer shall have no authority to obligate the company in any way; that the company has no interest in the dealer's accounts with his customers; and that no printed advertising or other matter of the company sent or distributed by the dealer shall change or modify the terms of the agreement.

A comparison of the provisions of the two agreements (that is the one employed prior to 1936 and that in effect when the assessments referred to were made, and presently) shows no substantial change was made in the relationship between the dealers and the plaintiff other than in particular respects hereinafter noted. The persons called "dealers" in the latter were denominated "representatives" in the former. In the earlier agreement the "representative's" compensation was termed a "commission" which was arrived at by applying certain percentages to the retail prices of items sold by the dealer; in the latter contract, the "dealer's" reward is envisaged as profit arrived at by deducting the wholesale price from the retail or other prices at which the dealer sells the goods. In reality the "commissions" in the one case are the "profits" in the other and vice versa. The difference is only in terminology. The provisions respecting credit arrangements, the system of ordering goods and the obligation of the dealer to pay for one order before the next shall be shipped to him, are identical in both, as is, also, the undertaking of the dealer to pay for sample gift items in installments. With respect to the plaintiff's right to the return of the sample case with its contents upon the termination of a dealership, the distinction between the provisions in the one agreement as compared to the other is unsubstantial.

Under the last, plaintiff has the right to refuse to receive back such demonstration outfit if it or the items of which it consists is not in fit condition, while under the first the dealer is required to return it and make good any missing item or any not in salable shape. In either case plaintiff may recapture the paraphernalia if it so determines. As concerns the right on plaintiff's part to terminate the relation the general provision in the last agreement is just as efficacious as is the more specific one in the first.

The assessment appealed from was made by defendant on November 5, 1941, for the amount due from plaintiff for the first and second quarters of 1941 as its contribution under the Unemployment Act for its dealers in Connecticut. While it has since been amended in various respects, (Chap. 280a of General Statutes, Sup. 1941; id., 1943; id., 1945) the authority under which it was made, is claimed by defendant to be conferred by the provisions of General Statutes Cum. Sup., 1939, Chap. 280a, entitled "Unemployment Compensation." The pertinent provision of this legislation relates to the contributions required to be made in furtherance of the objectives of the act, equivalent to a specified percentage "of the wages payable by [the employer] with respect to employment. . . ." General Statutes Cum. Sup. 1939, § 1336e. Under the provisions of § 1334e of said chapter there are two requisites to a valid assessment, namely, (1) that there be an employment and (2) that wages be payable by reason of such employment.. As the term "employment" is used, in this connection (subsection (a) (1) ) it is defined as meaning ". . . any service . . . performed under any express or implied contract of hire, creating the relationship of master and servant"; subsection (b) " 'Wages' shall mean all remuneration for employment, includ ing the cash value of all remuneration paid in any medium other than cash." Whether or not the relationship under examination is that of master and servant, or some other is usually a question of fact. *Electrolux Corporation* v. *Danaher,* 128 Conn. 342, 348, and cases cited. Such a determination ". . . depends upon divers considerations of varying importance, all of which must be considered, and no one of which is determinative." Ibid. In finality, however, the decisive consideration is whether or not "the plaintiff [had] the right of general control over the means and methods" of performing the work. id, p. 349 and cases cited. That criterion emanates from the conception that: "The independent contractor contracts to pro-

duce a given result by methods under his own control while the employee contracts to produce a given result subject to the lawful orders and control of the employer in the means and methods used." *Northwestern Mutual Life Ins. Co.* v. *Tone*, 125 Conn. 183, 190, 121 A. L. R. 993. While these principles are clear it is recognized that in many situations, their application is difficult. *Electrolux Corporation* v. *Danaher*, supra, 348; *Northwestern Mutual Life Ins. Co.* v. *Tone*, supra.

In this connection the sole material difference between the agreement made by plaintiff with its dealers in 1936 and that used before that time, becomes significant. The question whether the "representatives" referred to in the latter were employees or independent contractors is not involved in the instant case. But that the ante-1936 contract invited the contention that such persons were employees under its provisions is a tenable hypothesis. Not only does it suggest the residence of a right of control in the plaintiff of the means and methods of performing the work involved, but itself contains strictures on that subject in express terms. The reference here is to a certain method of approach to a potential purchaser and the manner of demonstrating the merchandise in the dealer's sample outfit, all as explained in a copy of "The Selling Demonstration Manual" furnished to the "representatives" as part of his equipment. A prominent feature of the technique was the distribution of gifts of small brushes. The use of this method as well as the exploitation of a block was assured in the ante-1936 agreement in this provision: "3. I agree to make a minimum of . . . demonstrations each week to assure me of a proper volume of sales and income and to assure you that customers will be called on at regular intervals. I further agree to give a Fuller Handy Brush or its alternative at every demonstration"; likewise in: "8. I agree to present customers with premium merchandise, in accordance with your premium plan and to pay you for such merchandise at your wholesale prices." In the regulation of the minimum number of demonstrations to be made each week and the adherence to the gift method of approach—even though a representative departed from the technique described in the manual in other respects—there was an evident attempt on plaintiff's part to exercise control over "the means and methods" of the performance of the work by the representative, the right to do which as conferred by the contract between the parties thereto is regarded as the surest index whether the relationship created thereby is that of em-

ployer and employee or some other. *Robert C. Buell & Co.*
v. *Danaher,* 127 Conn, 606, 611.

None of these provisions or others of like tenor or effect
appear in the contract which has been in use since 1936. In
practice plaintiff recommends the employment by dealers of
the technique expounded in the manual referred to supra. All
newly recruited dealers are offered instruction as concerns the
use and qualities of the many items contained in the outfit with
which they are furnished and in the selling methods, the em-
ployment of which plaintiff urges. They are afforded oppor-
tunity to witness actual demonstrations to customers of the
merchandise. The same opportunities are open to persons who
are engaged as dealers but who are not able to attain the sales
volume in their respective territories which they might be ex-
pected to yield if canvassed by a more skillful or experienced
operator. In all this the technique portrayed in the manual is
employed in whole or in part or used as a guide. However,
there is no requirement that either a novice or an initiate ac-
cept the instruction so made available to him or that he use or
apply any or all of the methods developed by plaintiff for the
use of its dealers. Plaintiff is interested primarily in the volume
of a dealer's sales and in his use of its selling methods only as
these conduce to expand them. Most dealers develope their
own sales technique, using such part or all of that recommended
by plaintiff as they find effective and rejecting all or such of it
as they individually deem expedient. Plaintiff, through its
branch and field managers and at weekly meetings and other-
wise, offers assistance to the dealers but acceptance of these
facilities is optional with the dealers and there is no insistence
on plaintiff's part that the dealers attend any of such meetings
or employ any particular method of demonstrating or selling
the goods made by it. The same abstinence from interference
on plaintiff's part characterizes other aspects of its relations to-
ward its dealers. The latter are given no sales quota for the
territories allocated to them, although furnished with various
incentives from time to time in the way of cash and other
prizes and distinctions in contests and otherwise. A dealer
determines for himself how many days per week and the num-
ber of hours per day and what hours they may be that he may
devote to the sale of plaintiff's products. If he wishes to take
a vacation he does so at any time that his convenience may
suggest, and often as not does not inform his field or branch
manager of his intention. He is furnished a list of retail prices

for each of the items which he sells and arrives at the wholesale price at which later he buys from plaintiff, by applying and deducting from such retail prices a certain percentage. While most dealers sell their customers at such retail prices they are not obliged to do so. Not infrequently individual dealers sell certain articles in excess of such retail prices and occasionally one sells below them. Neither are they restricted to placing orders with plaintiff in those instances only where they have already made sales to customers. Some dealers maintain a stock of items at their homes or some other convenient place of types of brushes that are most in demand so that they can make prompter delivery than by pursuing the usual routine. The terms upon which the dealers retail the merchandise are their own concern only. Some—especially those whose territories lie in the poorer districts— extend credit to their customers. In such cases, the loss, if any, must be borne by the dealer; plaintiff has no concern with the terms upon which any dealer may sell. The good will that may arise from the sale of its merchandise by dealers is not plaintiff's except in the limited sense that its name and merchandise is thereby advertised. Plaintiff, however, does not know the names or identities of any such purchasers from dealers or what items any individual buys or the price he pays the dealer for them. In calling on customers or delivering merchandise many of the dealers use motor vehicles. In such cases, no allowance is made to the dealer either for the use of his car, gas or oil consumed, depreciation, insurance premiums or other items of expense or outlay. Neither does the dealer place any lettering or other insignia upon such cars to identify them with plaintiff's business or its products. Dealers are furnished with a small button which they are privileged to wear authenticating their connection with plaintiff but there is no obligation upon their part to display them and many of them do not do so. Plaintiff does not insist upon a dealer pursuing any particular plan or system in canvassing the block allocated to him and he does so in accordance with his own judgment. Some do the work only in the evening, following some other avocation during the usual working hours. Though the effort is made to have as many full-time dealers as possible, a number sell in their territories on a part-time basis, only.

As observed supra it is not within the scope of the issues here to determine whether under the contract used until 1936, between plaintiff and its "representatives," the relation of em-

ployer and employee subsisted. What is apparent is that both as respects the written agreement employed commencing about 1936 and governing plaintiff and its dealers during the period for which the assessment was made, as well as in the practice of the parties under it, a radical change affecting the relations of the dealers and plaintiff as compared with that which existed under the former contract ensued. The fact, if it be a fact, that the representatives named in that agreement were employees did not, of course, deprive plaintiff of the right to enter into a contract of another character constituting the relation of independent contractor between itself and those who might sell its products, in the absence of bad faith or fraud. *Electrolux Corporation* v. *Danaher,* supra, 349. No lack of good faith or fraud is involved here. Neither is the situation, as the evidence discloses it, comparable to that presented in *Jack and Jill, Inc.* v. *Tone,* 126 Conn. 114, 118, where the conduct of the parties bore implications at variance with the purport of the written contract. These observations import the necessity of considering the questions presented, free from any adverse suggestions which might be implied under some circumstances that the relation between plaintiff and its dealers is but that which existed under the old form of contract between it and the "representatives."

The question whether during the period for which the assessment was made, the relation between plaintiff and its dealers was that of employer and employee is, usually, one of fact. *Electrolux Corporation* v. *Danaher,* supra 348. As observed in the cited cases, while the decisions frequently stress certain particular considerations as of predominant importance as supporting the conclusion reached, nevertheless " 'the ultimate test depends upon divers considerations of varying importance, all of which must be considered, and no one of which is determinative.' " *Electrolux Corporation* v. *Danaher,* supra, 348. Thus if the view is justified that the dealer's compensation is in reality a commission on the sale of plaintiff's merchandise instead of profits on the resale of goods purchased from plaintiff, that circumstance alone, though it be a frequent concomitant of the relation of employer and employee, would not be decisive. Such was the situation in two well considered cases in this jurisdiction, not withstanding which the conclusion that the relation was that of independent contractor and contractee was reached or sustained. *Electrolux Corporation* v.

*Danaher,* supra, 348; *Beaverdale Memorial Park, Inc.* v. *Dana-her,* 127 Conn. 175, 183.

A feature of more persuasive implications is the retention in one or both of the parties to a contract of the character involved here of the right to terminate it. Such a condition is not infrequently looked upon as harboring the right of general control of the manner in which the work is to be done. *Jack and Jill, Inc.* v. *Tone, supra,* 119. Its existence in the contract in the case of *Schomp* v. *Fuller Brush Co.* 124 N. J. L. 487, 490, the contract involved in which was apparently identical with that with which concern is had here, was deemed an important circumstance in reaching the conclusion that the dealer was not "free from control." However, the presence of an unlimited right to terminate a relation is not, in itself, conclusive. *Northwestern Mutual Life Ins. Co.* v. *Tone,* supra, 194. Neither, under the evidence in the instant case, does it appear that it was used arbitrarily or, in fact, to enforce compliance with any of the means or methods of performing the work recommended or urged by plaintiff. As noted supra, a primary requirement to the success of the plan upon which plaintiff relies to sell its factory output is a large number of dealers. In some blocks, notably at Hartford, at times, the turnover of dealers has been heavy. It would appear that plaintiff expends great effort in endeavoring to attract persons to enlist as dealers to sell its products and after their assignment to a block affords them continuous aid, co-operation and encouragement to increase their sales to a point at which they will find it advantageous to continue. The instances in which dealerships are terminated are in a great majority of cases where individuals acting in that capacity have failed to place any order for goods within a period of thirty days, which plaintiff regards as, at least, prima facie evidence of abandonment of the work. However, it is the employability of a right of termination exercisable to enforce compliance with the employer's direction of the means and methods of performing the work which is, alone, material to the issues here. The credible evidence reveals no instance where a dealership has been cancelled because of a failure or refusal of a dealer to follow any direction or rule concerning the manner in which or the method to be employed by the dealers in retailing the wares manuractured by it. The right to terminate is, of course, equally to be anticipated as an adjunct of contractual relations other than that of employer and employee—for example agreements under which persons

and firms sell manufactured products in assigned territory as jobbers or middlemen. It is not unusual in such cases that the manufacturer retain the right to refuse to sell such persons either because of dissatisfaction of the way in which they "push" the sale of its products or for any other reason. Under the circumstances disclosed here it is found that the right to terminate is equally as consistent with that of independent contractor as it is with that of a contract of hire and can be given no predominant effect in resolving the question involved.

While there are certain aspects of the instant situation which are compatible with the relation of master and servant yet viewing the contract and the practice of the parties under it in the light of the sales plan of which the dealers form a part and the relation of this to the problem of disposing of the merchandise manufactured by plaintiff, the conclusion is that the preponderance of evidence indicates that the dealers, in fact, are not subject to and there does not inhere in plaintiff the right of general control of the means and methods by which they sell plaintiff's goods. This conclusion necessarily implies that the relation of employer and employee does not characterize that subsisting between plaintiff and its dealers within the meaning of the act and, hence, that the assessment appealed from was illegally made.

The appeal is sustained; judgment accordingly.