[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR DIRECTED VERDICT FILED BY DEFENDANT, THE STAMFORD HOSPITAL
The principle issue to be decided in this motion for directed verdict is whether the "borrowed servant" rule is applicable in a medical malpractice case involving operative procedures. Other issues raised in the motion for directed verdict, will be discussed later in this memorandum.[1]
 FACTS
CT Page 5294
This lawsuit was originally brought in four counts by Herman Alswanger and his wife Myrna Alswanger against Douglas R. Smego M.D. and the Stamford Hospital, for medical negligence during a surgical procedure performed on March 19, 1990 in the Stamford Hospital. The first count by Herman Alswanger alleges negligence against Dr. Smego. The second count alleges negligence against the Stamford Hospital. The third and fourth counts restate the allegations of the first and second counts and were filed by the plaintiff Myrna Alswanger seeking money damages for loss of consortium.
The jury trial commenced on August 18, 1998 and was the first complex civil litigation trial in Connecticut. On the completion of the plaintiffs' evidence on November 6, 1998, the defendant, Stamford Hospital, filed a written Motion for Directed Verdict, supported by memorandum. The court granted the Hospital's Motion for Directed Verdict from the bench, leaving as the only remaining defendant, Dr. Douglas R. Smego. Thereafter, the case was tried on the remaining two count complaint to the jury.
The evidence before the jury most favorable to the plaintiffs is as follows: Herman Alswanger hired Dr. Douglas Smego as a private surgeon to perform a right leg vein stripping/ligation operation at the Stamford Hospital. The surgery took place on the afternoon of March 19, 1990. Immediately after the surgery, Mr. Alswanger noted an onset of right groin pain, different than he experienced in the past. The plaintiff offered testimony and expert witnesses to support his claim that during the March 19, 1990 operation, a tributary of the saphenous vein had been tied and ligated by suture material entrapping a tributary of the ilioinguinal nerve. As a result of this nerve entrapment, he suffered substantial pain. He was later treated by multiple medical specialists. In May 1991, the plaintiff had surgery performed by another physician at the Greenwich Hospital, in which a large fibrous mass in his right groin was removed in the area of the vein ligation operative site. In the Greenwich Hospital operation, a portion of his lymph system was removed. There was no claim that there was any negligence by the Greenwich Hospital surgeon in the removal of the lymph system. As a result of the May 1991 operation, lymphoceles developed, which resulted in lymphodema of his right leg. Medical testimony indicated that the lymphoceles and lymphodema are permanent disabilities.
The evidence further discloses that on March 19, 1990, Dr. CT Page 5295 Jay V. Dewell was a first year resident. He graduated from medical school and immediately became employed by the Stamford Hospital, which was then, and still is a teaching hospital. He had completed 9 months of his surgical residency training by March 1990. Both Dr. Dewell and Dr. Smego did the ligation vein stripping operation on the plaintiff on March 19, 1990. Dr. Dewell was a full participant in the operation, in that he did the opening incision, the tying off and ligating of a number of the tributaries of the greater saphenous vein with suture material, along with Dr. Smego, and closed the incision at the right groin operative site along with Dr. Smego. According to the testimony, the operation was performed by both Dr. Smego and Dr. Dewell. At no time did either Dr. Dewell or Dr. Smego leave the operating table or the operative site. At all times during the operation both doctors were present performing the surgery.
On March 19, 1990 Dr. Smego was a private physician, and had staff privileges at the Stamford Hospital as an attending surgeon. He was not an employee of the Stamford Hospital. On that date Dr. Jay V. Dewell was not a private physician and was an employee of the Stamford Hospital, engaged in the practice of medicine in a surgical residency program as part of his training.
The testimony demonstrated that both, Dr. Smego and Dr. Dewell, knew that they had a duty not to entrap a nerve, if the nerve was visible. On March 19, 1990 the standard of care in performing a vein stripping and ligation operation was to skeletonize the greater saphenous vein and all its tributary veins in order to make sure that there were no other tissues, nerves or structures adjacent to the vein. After the vein and its tributaries were skeletonized, the vein would be tied off with suture material and then cut. It was a violation of the standard of care to entrap a nerve with suture material in this process. All the experts so testified.
The plaintiffs commenced their evidence on August 18, and concluded their presentation on November 6, 1998. They offered the testimony of 13 witnesses including Dr. Smego and Dr. Dewell, as well as a number of experts. Over 100 exhibits were admitted into evidence by the plaintiff during the 12 weeks of their direct case. The hospital's Motion for Directed Verdict claimed that Dr. Jay V. Dewell, at all times during the operative procedure, was under the exclusive care, custody and control of Dr. Douglas Smego. Therefore, any negligence of Dr. Dewell would be attributed to the negligent supervision of Dr. Smego and would CT Page 5296 not be the responsibility of the Stamford Hospital. The Stamford Hospital does concede that during the. entire period of the operation, Dr. Dewell was an employee of the Stamford Hospital, but argues that the "borrowed servant" rule is an exception to the theory of respondeat superior. The hospital concludes that under the facts of the case, the "borrowed servant"rule applies and any negligence of Dr. Jay V. Dewell is attributed to Dr. Smego, not the Stamford Hospital. In addition the hospital claims that the plaintiff has failed to prove, 1) the entrapment of a nerve, 2) if a nerve was entrapped, which physician did the entrapping, and 3) the first element of "res ipsa loquitur".
 I.
Directed verdicts are not favored, but may be upheld if the jury could not reasonably and legally have reached a conclusion other than in the moving party's favor. Petyan v. Ellis,200 Conn. 243, 244 (1986); Merola v. Burns, 21 Conn. App. 633, 636, (1990). "In reviewing the trial courts decision to direct a verdict for a defendant, we must consider the evidence in the light most favorable to the plaintiff." Petyan v. Ellis, supra,200 Conn. 244. A plaintiff's case may be established by inferences drawn from circumstantial evidence, but "such inferences must be reasonable and logical the conclusions based on them must not be the result of speculation and conjecture."Boehm v. Kish. 201 Conn. 385, 389, (1986). "Directed verdicts are not favored and should be granted only when the jury could not reasonably and legally reach any other conclusion." (Internal quotations marks omitted) Giles v. New Haven, 228 Conn. 441, 443
(1994); Puro v. Henry, 188 Conn. 301, 303 (1982). Directed verdicts can be granted in medical negligence cases. Rodriguez v.Petrulli, 34 Conn. App. 871, 877 (1994).
 II
The defendant, Stamford Hospital's, lead argument for a directed verdict is the "borrowed servant" rule. This court previously denied the hospitals Motion for Summary Judgment on the "borrowed servant" issue on the basis that it presented a material question of fact. In moving for summary judgment on August 10, 1998, the hospital stated its view of the rule relying on a 1990 New York case. "The borrowed servant rule applies traditional agency principles in certain claims for medical malpractice, whereby a surgeon, may supplant a hospital as `master' of a Hospital employee by exercising supervision and CT Page 5297 control over and directing the manner in which the employees work is performed, thereby assuming liability for the negligence of the borrowed servant." Polliciana v. Misericordia HOSPITALMedical Center, 158 App.Div.2d 194, 557 N.Y.S.2d 902 (1990).
The "borrowed servant" rule states, "the person to whom the services of another's employee are loaned is responsible for the employees negligent acts only so long as the temporary master actually exercises supervision and control over the servant."Bria v. St. Joseph's Hospital, 153 Conn. 626, 630 (1966). Its common in other jurisdictions to use the phrase "borrowed servant" for this doctrine. The first application of this rule in Connecticut was in 1932. Parsons v. M.J. Daly Sons,114 Conn. 143 (1932). Parsons, not using the phrase "borrowed servant", applied the rule, citing as its authority, Scribner's Case231 Mass. 132, 120 N.E. 350 (Mass. 1918). The Parsons court stated that "the general test is whether the act is done in business of which the person is in control as a proprietor, so that he can at any time stop it or continue it, and determine the way in which it shall be done, not merely in reference to the result to be reached, but in reference to the method of reaching the result. . . . The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired." Parsons v. M.J. Daly Sons. supra, 114 Conn. 149.
Parsons applied the "borrowed servant" rule in determining which of two entities was obligated for an injured employee's workers' compensation. Parsons was an employee of M.J. Daly 
Son's, (Daly) a pipe and steam fitting company. The loaning of Parsons by Daly to the R.F. Worden Sons, Inc. (Worden) to install piping and fittings for a refrigerating apparatus, placed Parsons at the direction and control of Worden. Parsons was electrocuted during the installation process on Worden's factory roof Daly did not have, nor did it exercise any direction or control over the work that was being done at the Worden property, even though at all times the decedent remained an employee of Daly. Worden paid the equivalent daily wage to Parsons directly to Daly, which in turn paid Parsons.
A later case involving a horse and driver applied the "borrower servant" rule. Massolini v. Driscoll 114 Conn. 546, 550
(1932). The "borrowed servant" rule was applied in a workman's compensation motor vehicle case, involving the issue of which CT Page 5298 party had direction and control over the servant. Tierney v.Correia, 120 Conn. 140, 145 (1935); Tierney v Correia,123 Conn. 146, 150 (1937).
The Supreme Court visited but did not apply the "borrowed servant" rule in a medical malpractice claim in Bria v. St.Josephs' Hospital. supra, 153 Conn. 630. The plaintiff claimed that the defendant Dr. Frederick M. Bannon was negligent. Postoperatively a nurse had inserted a hypodermic needle into or close to the sciatic nerve in the plaintiff's left hip. The plaintiff claimed that, as the attending and operating physician, the defendant, Dr. Bannon, had the right to direct the nurses in the manner in which the injections were given, as to the site of the injection and as to the angle in which the needle was to be inserted. The plaintiff advanced the argument that since Dr. Bannon had the right to control the manner of injection, he was negligent in failing to exercise that degree of supervision and personally see to it that the nurses, in giving the injections, did so in a manner which would not cause the involvement of the sciatic nerve. The court labeled this claim as one sounding in respondeat superior — the master is liable for the negligent acts of his servant. The plaintiff argued that the nurses were either in the employ of Dr. Bannon or Dr. Bannon supplanted the hospital as their master by exercising control and supervision over the nurses during the preoperative and post operative procedures. The negligent injections did not occur during the operation or while Dr. Bannon was present. The Supreme Court concluded, "in the absence of assumption of control and direction by the doctor, the nurses did not become his servants." Bria v. St. Joseph'sHospital, supra, 153 Conn. 630. "Nor is there any evidence that the nurses were temporarily loaned to Dr. Bannon while they administered to the plaintiff so that the borrowed servant rule would apply in this case." Id., 630.
Although the Bria case was the first Connecticut case to use the phrase "borrowed servant" and discuss its applicability in medical malpractice, it did not involve the supervision of hospital employees by a private surgeon during surgery. Bria restated the rule as adopted in Connecticut in 1932: "Under that rule, the person to whom the services of another's employee are loaned is responsible for the employees negligence acts only so long as the temporary master actually exercises supervision and control over the servant." Id. 629; See also Parsons v. M.J. Daly Sons, supra, 114 Conn. 149. CT Page 5299
Whether the "borrowed servant" rule is applicable in medical malpractice, was discussed by the Supreme Court in Mather v.Griffin Hospital, 207 Conn. 125 (1988). The defendant hospital argued for the first time on appeal, that it was not responsible for the acts of the delivery room nurse, while she was working under Dr. Maric's supervision. Dr. Maric was a private physician delivering the plaintiff's child. The negligence claim against the hospital involved the lack of the resuscitation equipment in or near the birth surgery area. The Supreme Court stated, "This record does not contain any evidence whatsoever supporting application of the borrowed servant rule." Id., 137. UnderMather, the "borrowed servant" rule is still alive in the State of Connecticut, but has yet to be applied to a medical malpractice claim during an operation. The language in Mather
that the borrowed servant rule is applicable to medical malpractice cases is dicta.
The issue of control of the means and methods of doing work has also been considered in a number of cases in determining if a workers compensation claimant is an employee or an independent contractor. For example, if the means and method of sale is under the control of an employer, then the salesman is not an independent contractor. Aisenberg v. Adams Co. Inc.,95 Conn. 419, 423 (1920). The test of "means and method of doing the work" has also been applied in the following cases: Silverberg v. GreatSouthwest Fire Ins. Co., 214 Conn. 632, 639 (1990); Bourget v.Overhead Door Company Inc., 121 Conn. 127, 132 (1936); Cumbo v.E.B. McGurk Inc., 124 Conn. 433, 435 (1938); Electrolux Corp. v.Danaher, 128 Conn. 342, 349 (1941); Beaverdale Memorial Park,Inc. v. Danaher, 127 Conn. 175, 179 (1940); Ross v PostPublishing Co., 129 Conn. 564, 567 (1943); and Oleksinski v.Filip, 129 Conn. 701, 702-3 (1943); The issue of possession and control creating liability is also applicable and has a parallel in landlord-tenant matters. One who transferred possession and control of leased premises to a tenant is not liable for injuries occurring on the premises. Kim v. Convent of the Sacred Heart
DN3:95CV961 (AHN) [U.S.DC] (August 21, 1998, Nevas, J.), (22 Conn. L. Rptr. 13).
The court has the right to decide, the issue of control as a matter of law. Skuzinski v. Bouchard Fuels Inc., 240 Conn. 694,705 (1997); Hallas v. Boehmke Dubosz. 239 Conn. 658, 674 (1997);Abrahams v. Young Rubicam Inc., 240 Conn. 300, 307 (1997); See also Sivahop v. Harris, Superior Court. judicial district of Fairfield at Bridgeport, Docket Number 0351127 (Nadeau, J. CT Page 5300 September 11, 1998) (4 Conn. Ops. 1122); Tortorici v. Moosup Inc.,107 Conn. 143, 146 (1927) (Held as a matter of law that plaintiff's intestate was an independent contractor since the control exercised by the defendant related merely to the work to be done and not to the means and methods of doing it).
The plaintiffs do not argue that Connecticut has not adopted the borrowed servant rule. They claim that in a medical malpractice action alleging negligence in an operation performed by two surgeons, the rule does not apply. The plaintiffs argue that both surgeons may be liable and support this claim with three citations from the Restatement Second. "A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other." Restatement (Second) of Agency § 226. Where a servant acts within the scope of his employment for both masters, "he may cause both employers to be responsible for an act which is a breach of duty to one or both of them." Id. comment a (1958). When a servant is loaned to another, "there is an inference that [he] remains in his general employment, so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it." Restatement (Second) of Agency § 227, comment b (1958).
In support of this dual liability claim, the plaintiff points to such a holding in which a municipal hospital was held liable for the negligence of its resident on rotation to another hospital while on salary from the municipality. Diaz v. Martinez,760 F. Sup. 17 (D. Puerto Rico 1990). Diaz held that any directions given by the second hospital administrator did not amount to control or supervision of the resident physician, since such co-operation was essential for residency programs to function. The district court held that the common law borrowed servant rule was not applicable and noted that under that rule, the borrowed servant may be considered the employee of the lender agency, the borrowing agency or both. Diaz did not involve two surgeons in an operation, and thus, is not instructive.
The plaintiffs cited a closer factual situation involving the application of the borrowed servant rule in the context of the Federal Tort Claims Act (FTCA). Judge Squatrito held that a naval surgeon, who had been assigned to a private hospital by Navy orders, was acting within the scope of his federal employment, CT Page 5301 for the purpose of Connecticut law, when he treated the plaintiff so that the FTCA provided the exclusive remedy. The United States was held to be a proper party defendant in the plaintiff's claim based on the negligence of the naval surgeon, even though the surgeon may have been the borrowed servant of the private hospital. Aldridge v. Hartford Hospital, 969 F. Sup. 816 (D. Conn 1996). Since the plaintiff failed to exhaust his administrative remedies under the FTCA, the district court dismissed the claims against the United States and the naval surgeon. The court remanded the remaining issues as against the Hartford Hospital and the other physician, Dr. Jones, to the Superior Court, J.D. of Hartford at Hanford. Connecticut law was applied on the issue of borrowed servant, citing the same language this court has already used from Bria v. St. Joseph's Hospital, supra,153 Conn. 630, along with the direction and control language of Parsons.
 Aldridge involved a December 14, 1992 operation on the plaintiff's right hand performed by Dr. Jones and the naval surgeon as a resident assistant. Under Navy orders the naval surgeon was a Lt. Commander on active duty in the United States Navy assigned to Hartford Hospital as a resident in orthopedic surgery. The plaintiff claimed negligence in the treatment, but the record is not clear if the allegations of negligence only occurred during the surgical procedure. The plaintiff's finger had to be amputated in a later procedure. The district court judge found that Connecticut law did not cover whether the borrowed servant rule requires joint liability of both the lender and borrowing agency unless there is a finding that the naval surgeon was acting outside the scope of his lenders employment. Noting the silence of Connecticut law, agency rules were applied to FTCA principles. Since the specific acts of negligence could have occurred outside the operative field, this court does not find Aldridge binding. Aldridge does support this courts finding that the borrowed servant rule is applicable to medical malpractice.
The other cases cited by the plaintiffs do not support thei position. Abraham v. United States, 932 F.2d 900, (11th Cir. 1991). (FTCA claim of negligence of military physician during residency assigned to a hospital occurred in post-operative monitoring); Ward v. Gordon, 999 F.2d 1399, [999 F.2d 1399], (9th Cir. 1993) (Army officer under duty to his country to complete his residency program at a private hospital and thus was under two masters since the United States could recall him at any time. This case also involved a FTCA claim); Brickner v. Normandy OsteopathicCT Page 5302Hospital, 746 S.W.2d 108 (Mo.App. 1988) (Hospital rules partially controlled as operation performed by a resident with the supervision only of an attending surgeon, thus the evidence failed to establish that the hospital relinquished or abandoned its right of control over the resident); Grubb v. Albert EinsteinMedical Center, 398 A.2d 480, (Pa.Super. 1978) (Attending surgeon was not scrubbed in and could not directly approach the operative site nor participate in the use of sterilized equipment); Tansic v. Wagner, 329 A.2d 497 (Pa. 1974) (Failure of hospital staff, including intern, to keep track of surgical instruments. Evidence sufficient to have jury decide if attending surgeons and hospital intern were both liable).
 III
The court concludes that Parsons correctly states Connecticut's "borrowed servant" rule. Applying this rule to the evidence most favorable to the plaintiff, this court determines that Dr. Jay V. Dewell, during the plaintiff's, March 19, 1990 operation, while in the operating room, was the "borrowed servant" of Dr. Douglas Smego. The court draws this conclusion despite the following findings. Dr. Dewell was at all times an employee of Stamford Hospital. He remained under the supervision of the surgical residency program of the Stamford Hospital and subject to its discipline. Dr. Dewell was paid for his services during the plaintiff's operation by the hospital. His regular salary was paid by the hospital. During the operation he was performing his duties as a surgical resident. He was being trained as a surgeon by the Stamford Hospital. He was required by the Stamford Hospital to perform certain preoperative exams and tests on private patients. He prepared the operative summary after the plaintiff's operation. All of these duties he performed for the Stamford Hospital as its employee. It should be noted that there is support for the proposition that a medical residency agreement with a teaching hospital gives rise to an educational relationship rather than an employment relationship.Gupta v. New Britain General Hospital, 239 Conn. 574, 582 (1996).
There is no evidence to indicate, during the operative procedure itself, from the time the incision was made until the incision was closed, that Dr. Dewell was performing any duties whatsoever, other than those requested and supervised by Dr. Smego. Although he was an employee of the Stamford Hospital, he had been loaned by the Stamford Hospital to Dr. Smego to assist in performing the surgery. Both Dr. Smego and Dr. Dewell, claimed CT Page 5303 in their testimony that Dr. Dewell was only an assistant. In fact Dr. Dewell was a "co-operator" of the procedure. Regardless of whether he was acting as an assistant, or a "co-operator," there is no doubt that he was under the care, custody and control of Dr. Smego. Dr. Smego told him what scapel to use, what cut to make, what ties to make, where to make the ties and what equipment to use during the procedure. Dr. Smego had total control over the means and methods of the plaintiff's operation. The Stamford Hospital did not. Therefore, at all times during the operative procedure Dr. Dewell was the "borrowed servant" of Dr. Douglas Smego.
There was no evidence that the lack of any hospital equipment caused any injuries to the plaintiff There was no allegation of failure of hospital equipment. There was no evidence of any negligence by any hospital operative staff other than Dr. Dewell. There was no evidence of any negligence in any of plaintiff's pre or post operative care. The only testimony regarding negligence was that of the tying and ligating of a nerve to a tributary of the saphenous vein during the March 19, 1990 operation. There is no evidence that nerve entrapment took place at any other time or location other than during the March 19, 1990 surgery.
Therefore, applying the standards regarding a directed verdict, there is insufficient evidence to go to the jury on the issue of any negligence by the Stamford Hospital. The Motion for Directed Verdict is, therefore, granted as to the Stamford Hospital on the "borrowed servant" rule.
 IV
The defendant, Stamford Hospital, also moved for directed verdict on the basis that there was no evidence, that Dr. Dewell deviated from the applicable standard of care. The plaintiff counters that claim by conceding the plaintiff could not show, which of the two Doctors sutured a nerve during the stripping or ligation procedure. The plaintiff argues that in fact, it was either Dr. Dewell or Dr. Smego who sutured the nerve. There could be nobody else who sutured the nerve. Therefore, the plaintiff requests the application of res ipsa loquitur. The Plaintiff argues that Dr. Dewell is liable for negligence on the basis ofres ipsa loquitur and the Stamford Hospital is responsible for the negligence of Dr. Dewell under respondeat superior. Thus, the plaintiff claims that under res ipsa loquitur the hospital is liable even if the "borrowed servant" rule applies. CT Page 5304
The defendant hospital counters by stating that there was no evidence of who did what to whom. The defendant argues that res ipsa loquitur does not apply under the facts of his case since the first element of res ipsa loquitur is missing.
The latest res ipsa loquitur case is Baretta v. Otis ElevatorCompany. 242 Conn. 169, 175 (1997). Res ipsa loquitur translates to, "the thing speaks for itself" This theory varies the general rule that the mere occurrence of an injury does not create the presumption of negligence on the part of any person, and offers the plaintiff, under the appropriate circumstances, involving obvious or gross negligence, a way to get to the jury even in the absence of specific proof of negligence. Id. 175. The burden of proof does not shift, the rule does not give rise to a presumption and the rule has no evidential force. Ryan v. LilleyCo., 121 Conn. 26, 30 (1936).
In Connecticut, the doctrine of res ipsa loquitur applies only when two prerequisites are satisfied: 1) the situation, condition, or apparatus causing the injury must be such that in the ordinary course of events no injury would result unless from a careless construction, inspection or user; and 2) both inspection and user must have been at the time of the injury in control of the party charged with neglect. Baretta v. OtisElevator Co., supra, 242 Conn. 173-74. A third condition usually required in most jurisdictions is that "the injurious occurrence or condition must have happened inrespective of any voluntary action at the time by the party injured." (Internal quotation marks omitted.) Giles v. New Haven, supra, 228 Conn. 446; See also 58 Am.Jur.2d, Negligence § 480. This condition is not required in Connecticut. Giles v. New Haven, supra, 228 Conn. 454. Res ispa loquitur can be applied in a medical malpractice claim.Krause v. Bridgeport Hospital, 169 Conn. 1, 8 (1975); Haliburtonv. General Society, 133 Conn. 61, 65-66 (1946); Mozzer v. Bush,11 Conn. App. 434, 438 (1987).
Res ipsa loquitur does not apply when the plaintiff, as in this case, has alleged and introduced into evidence specific acts of negligence by each of the defendants. Pineau v. Home DepotInc., 45 Conn. App. 248 (1997), cert. granted, 243 Conn. 902
(1997), cert. improvidently granted, 245 Conn. 422 (1998).
The plaintiff argues that the first element can never be met by the plaintiff. The evidence established that nerve entrapment CT Page 5305 could have occurred in a non negligent matter through the natural development of scar tissue. Plaintiffs' expert on causation and standard of care, Dr. William Stahl, stated that scar tissue is a natural condition that occurs in virtually every operation. He testified that scar tissue could have formed in the operative site over a six week period of time, thus causing post operative entrapment of the nerve. That entrapment of a nerve caused by scar tissue would not be evidence of negligence, and would not be a violation of the standard of care. Dr. Stahl also testified, in the event that the scar tissue entrapped the nerve, the first notice of pain or disability to the plaintiff would be about the sixth post operative week. Dr. Stahl further noted that the plaintiff complained of pain in his right groin immediately after the operation. In Dr. Stahl's expert opinion the condition could not have been caused by scar tissue, and therefore, must have been caused by nerve entrapment by suture material. The issue of when the first onset of pain occurred was submitted to the jury.
This court concludes that res ipsa loquitur is not applicable because the first element, i.e., that "the situation, condition or apparatus causing the injury must be such that in the ordinary course of events, no injury would result unless someone had been negligent," has not been met. Baretta v. Otis Elevator, supra,242 Conn. 173-74. According to the plaintiffs' own expert this condition could have been caused by the natural formation of scar tissue, a non-negligent occurrence. Briganti v. Connecticut Co.119 Conn. 316, 318 (1934); Slimak v. Foster, 106 Conn. 366, 370
(1921); 67 A.L.R. 4th 544 (1998) (Res Ipsa Loquitur-Plural Medical Parties).
The plaintiff argues that a careful reading of cases from other jurisdictions required the Motion for Directed Verdict to be denied, where negligence must have occurred during an operative procedure. Some of these cases require the burden of proof to shift to the defendant to show lack of negligence. Some indicate that there are four elements in a res ipsa loquitur case. The Connecticut cases on res ipsa loquitur are straightforward and do not require the assistance of foreign jurisdictional analysis. The following cases are all rejected:Ybarra v. Spangard, 154 P.2d 687 (Cal. 1945); Fiumefreddo v.McLean, 174 Wis.2d 10, 496 N.W.2d 226 (1992); James v.Harrisburg Polyclinic Hospital, 496 Pa. 465, 437 A.2d 1134
(1981); and Becker v. Lake County Memorial Hospital West,560 N.E.2d 165 (Ohio 1990). No Connecticut case has cited any of the above cases. CT Page 5306
The plaintiff bears the burden of proof as to which of the two physicians were negligent. The jury cannot resort to surmise, guess, conjecture or speculation as to which physician had a duty and violated that duty. Mason v. Walsh, 26 Conn. App. 225, 230-31
(1991); Mozzar v. Busch, supra, 11 Conn. App. 438 n. 4.
This court concludes that based upon the failure of the first element of res ipsa loquitur, the Motion for Directed Verdict must be granted in favor of the Stamford Hospital.
The defendant, Stamford Hospital, having proven both arguments advanced in its Motion for Directed Verdict, to wit, the "borrowed servant" rule and the absence of the first element of the doctrine of res ipsa loquitur, the court grants the directed verdict in favor of the Stamford Hospital.
The court orders that the plaintiffs amend their complaint, deleting counts two and four. The trial will then proceed on the two remaining counts against Dr. Douglas R. Smego.
The court will instruct the jury on the "borrowed servant" rule as follows:
If you find the defendant, Dr. Smego was negligent, in that he deviated from the standard of care applicable to board certified general surgeons by ligating a nerve during Mr. Alswanger's March 19, 1990 surgery, and that such a deviation from the standard of care was a substantial factor in causing Mr. Alswanger's injuries, then you must return a verdict for the plaintiffs against Dr. Smego.
Similarly, if you find that Dr. Dewell was negligent, in that he deviated from the appropriate standard of care of a physician performing surgery by ligating a nerve during the surgery of March 19, 1990, and that such a deviation from the standard of care was a substantial factor in causing Mr. Alswanger's injuries, then you must determine whether Dr. Smego, as the attending surgeon, is liable for Dr. Dewell's negligence.
Let me explain the law to you in this regard. If a resident, such as Dr. Dewell, takes part in the performance of surgery, and is under the direction and control of the private surgeon in charge, such as Dr. Smego, so as to be his temporary servant during the surgery, any negligence by such resident during the surgery, CT Page 5307 which occurs while the resident is under the attending surgeons direction, is deemed in the law to be the negligence of the attending surgeon. Stated differently, if Dr. Dewell deviated from the standard of care during the surgery, and if Dr. Smego directed and controlled his acts during the surgery, then Dr. Smego was legally responsible for Dr. Dewell's negligence.
It is for you, the jury, to decide, under the facts of this case whether and to what extent any such control and/or direction were exercised by the attending surgeon, Dr. Smego.
There has been testimony during this case that both Dr. Dewell and Dr. Smego, that during the surgery on Mr. Alswanger, Dr. Dewell operated under the direction and control of Dr. Smego. You may consider his evidence in deciding this issue.
Thus, you must return a verdict for the plaintiffs against Dr. Smego if you find either that Dr. Smego was negligent, or that Dr. Dewell was negligent while under the direction and control of Dr. Smego.
If you find neither Dr. Dewell nor Dr. Smego negligent, then you must return a verdict for the defendant, Dr. Douglas Smego.
In addition to these jury instructions, the court will submit interrogatories to the jury in conformity with the above charge in order to determine from the jury if any acts or omissions of Dr.
Smego or any acts or omissions of Dr. Dewell caused the plaintiffs conditions and if the latter, whether Dr. Smego had the care and control of the methods and manner of the operation, at all times during the March 19, 1990 operation.
TIERNEY, J